BS/WMP:MA/CLS/JMK
F. #2016R01012

**16 M 0674**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MARK JOHNSON and
STUART SCOTT,

              Defendants.

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(18 U.S.C. § 1349)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        FRANCIS L. MACE, being duly sworn, deposes and says that he is the Special Agent in Charge ("SAC") with the Office of Inspector General, Federal Deposit Insurance Corporation ("FDIC-OIG"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between November 2011 and December 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK JOHNSON and STUART SCOTT, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Victim Company, and to obtain money and property from the Victim Company by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

        (Title 18, United States Code, Sections 1349 and 3551 et seq.)

## **INTRODUCTION**

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent at the FDIC-OIG since 2009. I have been the SAC since August 2014. Prior to working at the FDIC-OIG, I worked at the Internal Revenue Service, Criminal Investigation Division for nearly ten years. As part of my duties, I investigate criminal violations relating to white collar crime, including mail, wire and bank fraud, with the objective of protecting FDIC against fraud, waste and abuse. I have investigated numerous matters during the course of which I have conducted physical surveillance, interviewed witnesses, executed court-authorized search warrants and used other investigative techniques to secure relevant information.

2. I have supervised the investigation of wire fraud and conspiracy to commit wire fraud by the defendants MARK JOHNSON and STUART SCOTT, among others. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my supervision of this investigation, (b) discussions with other law enforcement agents involved in this investigation, (c) my review of consensual audio recordings and other electronic communications (including e-mail messages and Bloomberg chats), (d) my review of trading data, (e) my review of reports of interviews prepared by law enforcement agents involved in this investigation, and (f) bank and wire records and public records, among other sources of evidence.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose

2

of establishing probable cause to arrest the defendants MARK JOHNSON and STUART SCOTT, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrants sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated. Summaries of recorded conversations are based upon draft transcripts of these conversations, which are subject to revision.

## PROBABLE CAUSE

### I. The Defendants and the Relevant Entities

4. From approximately 2010 to 2016, the defendant MARK JOHNSON, a citizen of the United Kingdom and resident of London and New York, was the head of global foreign exchange ("FX") cash trading at HSBC Bank plc, a subsidiary of HSBC Holdings plc (referred to collectively as "HSBC"). JOHNSON supervised HSBC's worldwide FX cash business.

5. From approximately 1997 to 2014, the defendant STUART SCOTT, a citizen of the United Kingdom and resident of London, was an FX trader, and later a supervisor, at HSBC. In or about April 2011, SCOTT became HSBC's head of FX cash trading for Europe, the Middle East and Africa ("EMEA") in London. JOHNSON supervised SCOTT from approximately 2010 to 2014.

6. HSBC was one of the largest banking and financial services institutions in the world, with operations in EMEA, Asia-Pacific and the Americas. HSBC operated a global FX business. HSBC's three principal FX trading desks were located in New York, London and Hong Kong.

7. Prior to 2011, HSBC provided financial services to the "Victim Company." In December 2011, HSBC executed an FX spot transaction for the Victim Company in which it converted approximately 3.5 billion U.S. Dollars to British Pounds (the "Victim Company FX Transaction").

## II. Overview of the Fraudulent Scheme

8. From at least in or about November 2011 and continuing until at least in or about December 2011, the defendants MARK JOHNSON and STUART SCOTT, together with others, participated in a scheme to defraud the Victim Company by:

    a. Using information provided in confidence to HSBC by the Victim Company (namely, the Victim Company FX Transaction) to purchase Sterling in advance of the transaction, knowing that the transaction would cause the price of Sterling to increase, thereby generating substantial trading profits for HSBC and the defendants (a scheme that is commonly referred to as "front running") in breach of HSBC's duty of trust and confidence to the Victim Company;

    b. Causing the $3.5 billion purchase of Sterling to be executed in a manner designed to cause the price of Sterling to spike (commonly referred to as "ramping") to the benefit of HSBC and the defendants, and at the expense of the Victim Company, despite HSBC's representations to execute the transaction in the best interests of, and to avoid adverse market impact to, the Victim Company; and

    c. Making, and causing to be made, material misrepresentations and omissions to the Victim Company to further the scheme by, among other things, concealing HSBC's role in the spike in the price of Sterling.

4

## III. Relevant Definitions

9. The "FX market" enabled participants to buy, sell, exchange and speculate on currencies. Participants in the FX market included financial institutions, central banks, hedge funds, investment management firms and corporations.

10. An "FX spot transaction" (sometimes referred to as an "FX transaction") involved the exchange of a given amount of one currency, such as the U.S. Dollar ("USD" or "Dollar"), for the equivalent amount of another currency, such as the British Pound ("GBP" or "Sterling"), at an agreed upon price.

11. A "currency pair" was the relation of two currencies to each other. The first currency of a currency pair was called the "base" currency, and the second currency was called the "quote" currency. For example, one currency pair was GBP/USD, or Sterling/Dollar. In this pair, GBP was the base currency and USD was the quote currency. An order to buy GBP/USD was an order to buy the base currency (GBP) using the quote currency (USD) as consideration for the transaction. An order to sell a currency pair was an order to sell the base currency (GBP) and to receive the quote currency (USD). For example, GBP/USD 1.5620 meant that one Pound Sterling could be exchanged for 1.5620 Dollars.

12. "Fixes" were benchmark exchange rates. WM/Reuters ("WMR"), a financial services company, published hourly "fix" rates for various currencies. The WMR fix at 4:00 PM London time (the "4 PM fix") was one of the most widely used fixes in the world.

13. "P-books" was a phrase used by HSBC personnel to refer to internal HSBC accounts allocated to individual HSBC traders that allowed those traders to trade in any currency pair. Revenues generated in P-books accrued to the benefit of HSBC and were taken

5

into account for purposes of evaluating each trader's performance, promotion potential and compensation.

### IV. The Fraudulent Scheme

#### A. The Bidding Process

14. In approximately 2010, the Victim Company entered into an agreement with another company to sell part of its ownership interest in an Indian subsidiary for approximately $3.5 billion. Execution of the sale was dependent upon regulatory approval in India. If the sale was approved, the Victim Company planned to convert approximately $3.5 billion in sale proceeds into Sterling, which it then intended to distribute to its shareholders. In approximately 2011, the Victim Company, assisted by an advisory group (the "Advisor"), asked approximately ten banks, including HSBC, to bid on the right to execute the Victim Company FX Transaction.

15. Prior to providing the banks with the details of the Victim Company FX Transaction in a Request for Proposal ("RFP"), the Victim Company and the Advisor required the banks to enter into a confidentiality agreement that protected the Victim Company's confidential information relating to the Victim Company FX Transaction. In the confidentiality agreement HSBC executed, HSBC agreed to "keep the Confidential Information strictly confidential and not to disclose, sell, trade, publish or otherwise dispose of such Confidential Information . . . or discuss the same with, any third party, other than such duly authorised employees, officers and directors of [HSBC], as are strictly necessary to evaluate the Confidential Information." "Confidential Information" was defined to include "commercial, contractual, corporate and financial information" provided by the Victim Company and specifically included the RFP information.

6

16. HSBC further agreed to "use the Confidential Information solely for the purposes for which it is provided, details of which are set out in the RFP." After the confidentiality agreement was fully executed, the Victim Company and the Advisor provided HSBC with the RFP, which contained Confidential Information about the Victim Company FX Transaction.

17. The RFP provided in relevant part that:

> The RFP contains confidential information and has been delivered to relationship banks for information only and on the express understanding that (a) they shall keep the information included in the RFP confidential (except to the extent that such information is in the public domain), and (b) use it only for the purpose set out below. Save as specifically agreed in writing by [Victim Company], the RFP must not be copied, reproduced, disclosed, distributed or passed, in whole or in part, to any other person.
>
> The purpose of the RFP is to assist the relationship banks in their analysis of the proposed currency exchange transaction. The RFP should not be used for any other purpose without the prior written consent of [Victim Company].

18. Employees of HSBC who were given access to the Confidential Information were made "insiders" by HSBC to the Victim Company FX Transaction. In or about October 2011, the defendant MARK JOHNSON became an "insider" to the Victim Company FX Transaction. In or about November 2011, the defendant STUART SCOTT also became an "insider" to the Victim Company FX Transaction. As "insiders," JOHNSON and SCOTT knew they had an obligation not to misuse the Confidential Information, including by front-running.

19. After receiving the RFP for the Victim Company FX Transaction, HSBC employees sought to win the bid for the Victim Company FX Transaction. HSBC's pitch materials listed the defendant MARK JOHNSON as a member of the HSBC team for the transaction, along with Supervisor 1, the head of corporate structuring for EMEA at that time.

7

Supervisor 1 represented to the Victim Company and the Advisor that JOHNSON was responsible for managing the market risk associated with the Victim Company FX Transaction.

20. In the pitch materials, HSBC employees made representations to the Victim Company and the Advisor about confidentiality and HSBC's ability to execute the Victim Company FX Transaction at the best possible price and the lowest possible risk for the Victim Company. For example, the written HSBC pitch presentation stated:

   a. "Time to execute is essentially a choice for the company, as HSBC is able to provide one quote for the full amount or even drip feed the market in utmost confidential nature so as to ensure there are no sudden FX moves against the company;"

   b. "HSBC would work with you to ensure best execution [of the Victim Company FX Transaction] during the day"; and

   c. "[I]t is in the interest of the company to manage the process jointly with HSBC in case of undue market volatility. We would like to execute this in the best interest of the company . . . ."

B. HSBC Selected to Handle the Victim Company FX Transaction

21. On or about October 18, 2011, the Victim Company, through its Advisor, notified HSBC that it had been selected to handle the Victim Company FX Transaction "because they are the best and [had] acknowledged that they now have the pressure to deliver best execution."

22. Despite knowing that HSBC had represented to the Victim Company that it would execute the transaction in the Victim Company's best interests and keep the Victim Company FX Transaction confidential, the defendants MARK JOHNSON and STUART SCOTT planned to benefit HSBC, and ultimately themselves, at the Victim Company's expense

8

by (a) using their insider knowledge of the Victim Company FX Transaction to front-run that transaction, and (b) ramping the price of Sterling/Dollar to the benefit of HSBC, and to the detriment of the Victim Company.

23. In a phone call with Victim Company and the Advisor on or about November 28, 2011, the defendants MARK JOHNSON and STUART SCOTT were notified that the Victim Company FX Transaction might occur soon.

24. On that same day, on or about November 28, 2011, in preparation for a call among the Victim Company, the Advisor and HSBC employees, Supervisor 1 gave advice about ramping the market in a manner that would not raise suspicions of the Victim Company or its Advisor. Supervisor 1 stated to the defendant STUART SCOTT during a phone call that, among other things, the Victim Company viewed the Advisor "as an agent in between who will be closely monitoring it when we are doing [the Victim Company FX Transaction], . . . . So we don't want . . . to push the market too much high[er] and at the same time we want to make money on this."

25. On or about November 30, 2011, the defendant MARK JOHNSON made a purchase of Sterling in exchange for Euros, which was booked in his P-book. JOHNSON held the Sterling he purchased until the day of the Victim Company FX Transaction, when he sold the currency for a profit to HSBC.

26. On or about December 5, 2011, the defendants MARK JOHNSON and STUART SCOTT received additional information relevant to the timing of the Victim Company FX Transaction, specifically, a news article was circulated to them reporting that the underlying sale by Victim Company of its Indian subsidiary had received regulatory approval.

27. On that same day, on or about December 5, 2011, the defendant MARK JOHNSON traveled to New York. While in New York, JOHNSON directed an FX trader in HSBC's New York office to purchase Sterling in exchange for Dollars, which JOHNSON later sold for a profit to HSBC on the day of the Victim Company FX Transaction. The next day, on or about December 6, 2011, SCOTT purchased Sterling in exchange for Euros, which the defendant STUART SCOTT later sold for a profit to HSBC on the day of the Victim Company FX Transaction.

C. The Execution of the Victim Company FX Transaction

28. On or about December 7, 2011, the Victim Company contacted HSBC about executing the Victim Company FX Transaction on that day. Supervisor 1 arranged for a call at approximately 1:35 PM London time between the Victim Company, the Advisor, Supervisor 1 and the defendants MARK JOHNSON and STUART SCOTT to discuss whether the Victim Company FX Transaction should be executed at the 3 PM fix or the 4 PM fix. Both SCOTT and JOHNSON knew that because there was less liquidity at the 3 PM fix, currency prices at that earlier time were easier to manipulate than prices at the 4 PM fix, so it was advantageous to them and HSBC, and disadvantageous to the Victim Company, to execute the Victim Company FX Transaction at the 3 PM fix.

29. Initially during the December 7, 2011 call, the defendant STUART SCOTT falsely and fraudulently suggested to the Victim Company that the 3 PM fix had more liquidity than the 4 PM fix. When confronted by the Advisor about that assertion, SCOTT falsely and fraudulently stated that the fixes were the same in terms of liquidity. SCOTT then stated there was more volatility at the 4 PM fix and the defendant MARK JOHNSON stated that he "personally would recommend" the 3 PM fix "so there's an element of surprise." SCOTT

further stated that: "That's an excellent point actually, yeah. Because people do look for that, for the significant flows to happen at 4 o'clock and once they get a smell of that or a smell of significant flow going through, they will try to jump in front and start to muck around in the markets."

30. The Victim Company followed the HSBC recommendation to execute the Victim Company FX Transaction at the 3 PM fix.

31. The defendants MARK JOHNSON and STUART SCOTT, anticipating that the execution of the Victim Company FX Transaction by HSBC would drive up the price of Sterling/Dollar, quickly orchestrated front-running purchases of Sterling for HSBC. Specifically, within minutes of the phone call with the Victim Company, SCOTT directed the purchasing of Sterling/Dollar in his P-book. JOHNSON and SCOTT also caused other FX traders at HSBC in both London and New York to purchase Sterling prior to the Victim Company FX Transaction in their P-books. These front-running purchases would and did allow the defendants and others to generate significant profits for HSBC.

32. The Victim Company placed its order with HSBC to buy approximately 2.25 billion Sterling (equivalent to selling approximately $3.5 billion) in two tranches prior to the 3 PM fix—at roughly 1:51 PM and 2:28 PM London time.

33. The defendants MARK JOHNSON and STUART SCOTT were in communication with each other concerning the execution of the Victim Company FX Transaction. For example, during a consensually recorded phone call at approximately 2:28 PM London time, JOHNSON commented to SCOTT, "Seems that they're starting to bite," in reference to the Victim Company's orders. In response, SCOTT stated, "full amount" (indicating that the Victim Company had authorized the full order of 2.25 billion Sterling).

JOHNSON then responded, "No, you're kidding?" SCOTT then re-confirmed that Victim Company had indeed authorized the full purchase, to which JOHNSON replied "Ohhhh, f***ing Christmas."

34. During a consensually recorded phone call at approximately 2:54 PM London time, the defendants MARK JOHNSON and STUART SCOTT discussed the Victim Company FX Transaction again. During that call, the defendants discussed how high they could "ramp" the price of Sterling/Dollar before the Victim Company would "squeal." HSBC "ramped" the price Sterling/Dollar by aggressively trading before and during the fix in a manner designed to increase the price of Sterling/Dollar. As a result, the price of Sterling/Dollar spiked at the 3 PM fix. Indeed, the price of Sterling/Dollar at the 3 PM fix was the highest price for Sterling/Dollar that day, allowing JOHNSON, SCOTT and other FX traders at HSBC, to generate significant profits in their P-books from their prior Sterling purchases. Neither JOHNSON nor SCOTT disclosed their own P-book trades or the P-book trades of other FX traders at HSBC in Sterling to the Victim Company.

35. On or about December 7, 2011, the Victim Company and the Advisor monitored the price of Sterling in the FX market in anticipation of the Victim Company FX Transaction. When the Victim Company and the Advisor observed upward movement in the price of Sterling between 2:00 PM and 3:00 PM London time, they questioned Supervisor 1 about these price movements. At approximately 2:45 PM London time, Supervisor 1 told the defendants MARK JOHNSON and STUART SCOTT that the Victim Company was calling at "every uptick" in reference to the price of Sterling. Finally, just after 3:00 PM London time, Supervisor 1 told JOHNSON and SCOTT that he had told the Victim Company that "a Russian name" was buying at the same time as the Victim Company. Accordingly, JOHNSON and

SCOTT knew that the Victim Company had been falsely and fraudulently assured that the upward price movement in Sterling/Dollar was attributable to a "Russian name."

36.  Soon after 3:00 PM London time on December 7, 2011, the defendants MARK JOHNSON and STUART SCOTT, together with others from HSBC, discussed the Victim Company FX Transaction with the Victim Company and the Advisor. JOHNSON and SCOTT, among others, made and caused to be made misrepresentations to the Victim Company and the Advisor to conceal their misconduct with respect to, inter alia, the cause of the upward price movement in Sterling/Dollar prior to the 3 PM fix and the timing and manner in which HSBC handled the Victim Company FX Transaction.

37.  For example, the defendant STUART SCOTT represented to the Victim Company and the Advisor that the Victim Company FX Transaction went "okay" despite an "initial jump" in the price which he falsely and fraudulently attributed to trading by a Russian bank. Contrary to SCOTT's representation and as SCOTT well knew, HSBC was responsible for the increase in the price of Sterling/Dollar prior to the Victim Company FX Transaction, not a Russian bank.

38.  Additionally, the defendant STUART SCOTT falsely and fraudulently stated to the Victim Company and the Advisor that HSBC began "taking action" in the FX market approximately five minutes prior to the 3 PM fix. Contrary to SCOTT's assertion, and as SCOTT well knew, HSBC had purposefully been exerting upward pressure through its transactions in the Sterling/Dollar market well prior to 2:55 PM London time.

39.  In the days immediately following this discussion, the Victim Company undertook to settle the Victim Company FX Transaction with HSBC, during which process wires sent in furtherance of the scheme were transmitted from the Eastern District of New York

outside the State of New York. In total, HSBC gained approximately $5,000,000 from its execution of the Victim Company FX Transaction and approximately $3,000,000 from the P-book trades of the London and New York FX traders.

## V. Conclusion

WHEREFORE, based on the foregoing, your deponent respectfully requests that arrest warrants be issued for the defendants MARK JOHNSON and STUART SCOTT so that they may be dealt with according to law.

Because public filing of this document could result in a risk of flight by the defendant MARK JOHNSON, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrants issued in connection with this complaint, be filed under seal.

Dated:   Brooklyn, New York
         July 19, 2016

_____
FRANCIS L. MACE
Special Agent, FDIC-OIG

Sworn to before me this
19th day of July, 2016

_____
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

14